1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

```
- - - - - - - - - - - - - - -X
 UNITED STATES OF AMERICA,    :  15-CR-00051-S-PAS-2
                              :
                              :
                              :
                              :
    -against-                 :  United States Courthouse
                              :  Providence, Rhode Island
                              :
                              :
                              :
 DAVIS SULLIVAN, et al.,      :  Wednesday, March 8, 2017
         Defendant.           :  3:00 p.m.
                              :

- - - - - - - - - - - - - - -X
```

TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
BEFORE THE HONORABLE WILLIAM E. SMITH
UNITED STATES CHIEF DISTRICT COURT JUDGE

A P P E A R A N C E S:

For the Government:    STEPHEN DAMBRUCH, ESQ.
                       Acting United States Attorney
                       District of Rhode Island
                           100 Westminster Street, #800
                           Providence, Rhode Island  02903
                       BY:  PAUL F. DALY, ESQ.
                           Assistant United States
                           Attorney

For the Defendant:     LAW OFFICE OF JOHN L. CALCAGNI, III
                           One Custom House St., Suite 300
                           Providence, RI  02903
                       BY:  JOHN L. CALCAGNI, ESQ.


Court Reporter:  Lisa Schwam, CRR, RPR, RMR
                 Official Court Reporter


Proceedings recorded by computerized stenography.  Transcript
produced by Computer-Aided Transcription.

1          (In open court.)

2          THE COURT:  All right.  Good afternoon.  This is

3    the matter of the United States vs. Davis Sullivan.

4    We're here for sentencing this afternoon.  Let's begin

5    by having counsel identify themselves for the record,

6    please.

7          MR. DALY:  Good afternoon, your Honor.

8    Assistant United States Attorney Paul Daly joined at

9    counsel table by Sergeant Cynthia Trahan of the Rhode

10   Island State Police.

11         MR. CALCAGNI:  Good afternoon, your Honor.  John

12   Calcagni for Davis Sullivan.

13         THE COURT:  All right.  Thank you.

14         So we'll begin by reviewing the presentence

15   investigation report that I received from the Office of

16   Probation.  Mr. Calcagni, if you could just confirm

17   that you have reviewed the presentence report with your

18   client, that you've been able to answer all of his

19   questions.

20         MR. CALCAGNI:  Yes, your Honor.  That's

21   accurate.

22         THE COURT:  All right.  So there are some

23   objections to the presentence report?

24         MR. CALCAGNI:  Your Honor, the only objection I

25   really wish to press is that to paragraph 42 which

1    deals with the firearm enhancement.  I briefed or

2    outlined in writing yesterday my argument in support of

3    that enhancement not applying to the facts and

4    circumstances of Mr. Sullivan.  And I'm prepared to

5    rest on those written submissions unless your Honor has

6    any particular questions.

7            THE COURT:  Well, Mr. Daly, do you want to

8    respond to what Mr. Calcagni has argued with respect to

9    the enhancement?

10           MR. DALY:  Just briefly if I may, your Honor?

11           THE COURT:  All right.

12           MR. DALY:  Thank you.  Your Honor, the defendant

13   was afforded that two-level increase for possession of

14   a firearm based primarily on two separate aspects of

15   the government's statement of facts set forth at

16   paragraphs, I believe, 13 to 35 of the presentence

17   report.  And those two paragraphs that I'm referencing

18   deal with two separate dates.

19           On April 27th of 2015, during the course of the

20   wire interception, there was recorded conversations

21   wherein Mr. Sullivan is speaking with a coconspirator

22   Mr. Hernandez.  Mr. Hernandez tells Mr. Sullivan that

23   there are rival gang members on Croyland Road in

24   Providence.  Mr. Sullivan is stopped by police in that

25   area minutes later.

1          Immediately after that phone conversation, Mr.

2    Sullivan -- excuse me.  Immediately after being stopped

3    by the police, Mr. Sullivan has a subsequent phone

4    conversation with Mr. Hernandez wherein he says to

5    Mr. Hernandez, essentially, I can't believe they didn't

6    find the firearm.  And that is summarized at paragraph

7    33 in the presentence report.

8          In addition, your Honor, the firearm enhancement

9    is also justified in paragraph 35 of the presentence

10   report wherein on the day that Mr. Sullivan was taken

11   into custody at Houston Street in Providence, Rhode

12   Island, another individual was present there.  She was

13   interviewed by police.  They asked, Have you ever kept

14   a weapon at the residence?  And she advised, Yes, but

15   two weeks ago I told him to take the handgun out

16   because I didn't want it there.

17         The relevancy of these statements, your Honor,

18   as regards to the drug trafficking and their

19   establishing that he possessed a firearm, include the

20   following facts:  The vehicle that he was stopped in on

21   April 27th by the police and the one where he told

22   Mr. Hernandez I can't believe they didn't find the gun

23   in the car, was the gun that he used repeatedly through

24   March till May as a vehicle -- excuse me.  Was the

25   vehicle that he used between March and May to

1  facilitate his drug-trafficking operation.  He used it

2  to supply the runners.  He used it to pick up drugs.

3  He used it to participate in meetings with other

4  coconspirators.  So that vehicle was critical to the

5  operation of the drug-trafficking conspiracy, and

6  that's where he said he had the firearm on April 27th

7  of 2015.

8         With regard to June 11th of 2015 and his

9  admission to the cotenant that he had a gun there in

10  the weeks before, it's relevant with regard to this

11  enhancement, your Honor, because on June 11th when he's

12  arrested there are quantities of drugs found at that

13  residence including approximately 23 grams of crack

14  cocaine.  So I'd suggest to the Court that as noted in

15  Commentary 11 to the Section 2D1.1(b)(1) of the

16  Guidelines, is it clearly improbable that the defendant

17  possessed -- excuse me, that the possessed firearm was

18  connected to this offense?

19         I would say to the Court, no, it's not clearly

20  improbable that the firearm that the defendant admitted

21  possessing to both Jonathan Hernandez and to his

22  roommate, it's not clearly improbable that a firearm

23  that he possessed was connected to this offense.  Thank

24  you, your Honor.

25         THE COURT:  Okay.  Thank you.

1           All right.  Well, this is not a situation that's

2      like the more typical situation where a firearm is

3      discovered in the course of the arrest.  And here there

4      was no firearm found.  But the Guidelines don't require

5      a firearm to actually be found in order for the

6      enhancement to apply; rather, it just has to be as Mr.

7      Daly said, or another way of saying it is that it's

8      more probable than not that a firearm was possessed in

9      connection with the crime.

10          And really perhaps the best evidence of that

11     would be the fact of a firearm being found.  But the

12     next best evidence it seems to me is the evidence that

13     there is here, which is a recorded conversation in

14     which the defendant in his own words makes a statement

15     that clearly demonstrates that a firearm was possessed.

16          So I think that the requirement of the Guideline

17     provision and the commentary to the Guideline provision

18     would support the finding by probation that a firearm

19     was possessed, and so for that reason I'm going to deny

20     the objection.

21          So as Mr. Calcagni said, that's the only

22     objection that's being pressed so with that I'm going

23     to accept the presentence investigation report as it's

24     currently drafted, and I'm going to utilize it for

25     purposes of sentencing here this morning -- or this

1    afternoon.

2            So I'm going to now set forth on the record the

3    advisory Guideline calculations as they are described

4    in the presentence report.  And then we'll move from

5    that to hearing from counsel with regard to the

6    appropriate sentence.

7            So we begin with the base offense level on Count

8    One, the conspiracy count.  That level is 26.  The

9    two-level enhancement that we just discussed is

10   applied.  There's also an adjustment for the

11   defendant's role.  He receives a three-point adjustment

12   because he was a manager or supervisor but not an

13   organizer or leader.  And all of that yields an

14   adjusted offense level of 31.  The defendant receives a

15   three-point downward adjustment for acceptance of

16   responsibility.  And that gives him a total offense

17   level of 28.

18           The defendant's criminal history is summarized

19   in paragraph 58 of the report.  He has two criminal

20   history points.  He receives an additional two points

21   because he committed this offense while he was under a

22   Criminal Justice sentence in a state court matter.  And

23   therefore, he has a total of four criminal history

24   points which places him in Criminal History Category

25   III.

1          So at level 28 and Criminal History Category of

2     III, the defendant's advisory Guideline range is 97 to

3     121 months of incarceration.  There is a five-year

4     mandatory minimum that applies in this case.

5          So I'll hear first from the government with

6     respect to the appropriate sentence.

7          MR. DALY:  Thank you, your Honor.  The

8     government filed with the Court a sentencing memorandum

9     which I'm sure the Court is aware of and has reviewed.

10    And without forfeiting the position which is set forth

11    in that sentencing memorandum which is, essentially,

12    the government believes a Guideline sentence here is

13    appropriate, having experienced a few of the

14    sentencings in this case with you, I think my time

15    might be better served and the Court's probably more

16    interested in the space between 60 months and 72.  So

17    I'll focus my energy there.  Although I'm not

18    forfeiting in any way the argument that we think a

19    Guideline range sentence is appropriate.

20          THE COURT:  I understand.

21          MR. DALY:  Thank you, your Honor.  Your Honor, a

22    natural place to start might be looking at how the

23    other codefendants who have been sentenced or

24    individuals associated with this activity have been

25    sentenced as a baseline.  You had before you just a few

1    weeks ago Mr. Hernandez and you've had others as well.

2    Let me just sort of break it into three categories.

3    That sort of provides some perspective.

4         There were a group of individuals who were

5    prosecuted in state court referenced in Mr. Calcagni's

6    memorandum and in mine as well.  There's a group of

7    individuals who were prosecuted in federal court -- I'm

8    going to call the cocaine group -- and then there's a

9    heroin group who have all appeared before you, your

10   Honor.

11        With regard to the state offenders, they have

12   all -- their cases have all been adjudicated in state

13   court.  The wire interceptions in this case, the Court

14   authorized wire interceptions from March until May of

15   2015 with the result of a lengthier investigation by

16   the FBI's Safe Streets Task Force.  That investigation

17   included a series of controlled buys where a cooperator

18   purchased narcotics from a member or members of this

19   organization using the same method that the

20   investigators uncovered during their March to May wire

21   intercept investigation; that is, that a call was

22   placed to the dispatch phone of the organization and

23   then a runner delivered the drugs to a purchaser.

24        Prior to March of 2015 and part of the

25   foundation for the wiretap was that the cooperator

1  called the dispatch phone and then met with a member of

2  the organization and purchased drugs.  The individuals

3  who were prosecuted in the state court were the

4  individuals who made the deliveries of heroin to the

5  cooperator which were the predicates or the foundation

6  for the wire intercept investigation.  The individuals

7  in state court were all charged with between one and

8  six deliveries of heroin.

9      But bearing in mind that those purchases were

10  for fractions of a gram, between one and -- excuse me,

11  between .3 or .4 grams of heroin each time.  So for

12  sake of discussion, one of the individuals in state

13  court, Jose Alvarez, made six deliveries.  The total

14  amount of heroin he would have delivered under that

15  formula would be approximately 2.4 grams of heroin.

16      The six individuals who were convicted in state

17  court all by pleas received between 9 months and 30

18  months to serve.  The individual who received the most

19  significant sentence in state court was Michael

20  Akinrinlola.  He was convicted of four deliveries to

21  the cooperator.

22      The next group, next block of individuals who

23  were the targets of this investigation, were the

24  cocaine group.  And you've heard about them; John Lenis

25  Steven Lenis, Fernando Holguin, Victor Cortes and Jason

1    Orange.  Those individuals received between 18 and 46

2    months, but all of those individuals pled to offenses

3    related to the cocaine aspect of this investigation.

4         Now, Mr. Calcagni makes reference in his memo to

5    the fact that the Lenis brothers supplied the heroin to

6    the Hernandez organization.  That information comes

7    from the government because that's the government's

8    working theory.  The wiretap investigation yielded a

9    high level of suspicion that the Lenis brothers were a

10   supplier of heroin to the Hernandez organization.  And

11   most certainly had there been sufficient evidence to

12   charge them with that, they certainly would have been.

13        It was sufficient evidence to both charge and

14   convict them of being cocaine distributors and also

15   conspiring with other individuals -- Holguin, Cortes

16   and Orange -- to distribute cocaine, but there was

17   simply not enough evidence to charge them on the heroin

18   side.  Those individuals, as I say, received sentences

19   between 18 months to serve and 46 months to serve.

20        The next group or the next block --

21        THE COURT:  Those are Judge McConnell's

22   defendants.

23        MR. DALY:  They were, yes.

24        And the third block of individuals are the

25   heroin distribution group who appeared before your

1   Honor, and your Honor is quite familiar with those

2   sentences.

3        I would say that sort of for comparison

4   purposes, you know, Mr. Hernandez received 6 months,

5   the 72-month sentence that you gave -- excuse me, 6

6   years, the 72-month sentence that you recently gave

7   him.  And still outstanding is Gianfranco Rodriguez.

8   Gianfranco Rodriguez at this time is facing a five-year

9   mandatory minimum sentence.

10        With regard to the federal offenders, Mr. Nunez

11   and Mr. Brown who are in the deferred sentencing

12   program, they accepted responsibility; Mr. Nunez for

13   105 grams of heroin, Mr. Brown for 161 grams.

14   Mr. Pena, who was sentenced by you to 24 months to

15   serve accepted responsibility for 256 grams.  And

16   Mr. Rodriguez has accepted responsibility for 134

17   grams.

18        This defendant, like coconspirator Jonathan

19   Hernandez, is responsible for 560 grams of heroin,

20   substantially more than anybody else.  And that's a

21   reflection of his role here in the organization which

22   led to him receiving an enhancement for his role.  So

23   I'd suggest to the Court that Mr. Rodriguez at 134

24   grams will receive, if the landscape doesn't change, 60

25   months.  Mr. Hernandez will receive -- has received 72

1      months.

2              In addition, your Honor, to looking simply at

3      comparison -- looking at these individuals

4      comparatively, there's a couple of other things I'd

5      just like to speak about, your Honor, one being the

6      criminal history of the defendant.  Mr. Calcagni in his

7      memorandum yesterday commented on the -- essentially

8      what is -- or functionally what is an argument that his

9      criminal history overrepresented, although technically

10     it doesn't meet the standard I guess for a reduction in

11     the Guideline range.

12             I would suggest to the Court that a floor in the

13     argument is this, your Honor:  The date cited as the

14     offense date is June of 2015 which is Mr. Sullivan's

15     arrest date.  And from that arrest date the argument

16     then flows that he would have been off probation in six

17     months and had he been off -- you know, he almost made

18     it to the end of probation so the two points that he

19     received committing this offense while on probation

20     simply overreflects his true criminal history.

21             I suggest to the Court that there is evidence

22     that his involvement in this conspiracy predates June

23     of 2015 by a period of time substantially so that the

24     Court can feel comfortable that the defendant simply

25     didn't, you know, get involved here right at the end of

1     his period of probation.

2            And that brings me to the next point for the

3     government, your Honor, which is the defendant's

4     sentence here should reflect that he was involved in

5     sustained and persistent behavior.  As I've talked

6     about before, this was a highly successful retail

7     operation.  Mr. Sullivan, as noted in the government's

8     sentencing memorandum, worked quite closely with

9     Mr. Hernandez to facilitate the successful operation.

10    And it was because of his day-to-day participation,

11    that persistent criminal behavior that he engaged in

12    with Mr. Hernandez, that the organization flourished as

13    it did.  So I think the punishment should reflect that,

14    your Honor.

15           And finally, your Honor, I'd just ask you to

16    keep in mind when you sentence him, as I've said before

17    in coconspirator cases whenever I've appeared before

18    you, that the purpose of this investigation wasn't

19    simply to address a drug-trafficking problem.  It was

20    to address an identified problem where there was an

21    unholy alliance between drug trafficking and gang

22    activity.

23           And as noted in the government's sentencing

24    memorandum in the attachments to that, this defendant

25    played a significant role in both of those activities.

1    There are two things which, if I may, I'd just like to

2    briefly directly comment on, your Honor.  And that's

3    this:  On April 24th of 2015, the defendant was

4    monitored in a conversation with another individual.

5    To put this in perspective, Josue Harney was a

6    member-- also referred to as "Geek," that was his

7    nickname.  Josue Harney was a member of C-Block or The

8    Fam or TFD, whatever moniker you use for the group of

9    which Mr. Sullivan is clearly associated to.  Josue

10   Harney, a member of that group, was killed, I believe

11   I'm going to say, 2014, but my dates are off.  It might

12   been before that, your Honor.

13        In any event, the killing of Josue Harney, aka

14   "Geek," was a significant fact for members of C-Block.

15   He was very close to them and affiliated with them.  In

16   the Attachment B which I provided to the Court, which

17   is the music videos and the still shots and the music

18   videos, you see many of the members of C-Block wearing

19   "I think I'm Geek" shirts in those music videos, one of

20   which through the city Mr. Sullivan appears in while

21   other people are wearing the "I think I'm Geek"

22   t-shirts representing their affection for Josue Harney

23   and their anger at his loss.

24        That was manifest on April 24th.  The

25   defendant's -- the affect that that murder had on the

1    defendant was the fact that on that April 24th

2    intercepted conversation on that day, and this is at

3    page 17 of Exhibit A to the government's sentencing

4    memorandum, a caller calls up Mr. Sullivan and says, "I

5    got the drop man."  And Mr. Sullivan says, "You got the

6    drop?"  And the caller says, "Yeah, on this nigga, I

7    know where he lives at."  And Mr. Sullivan says, "Who?"

8    And the caller says, "(Unintelligible) killed Geek man.

9    The Whiteboy called me and told me the exact house he

10    lives in man."  And Sullivan says, "Let's go get him."

11    And the caller says, "That's what I'm sayin'.  I got my

12    own grip right now.  I got my own grip right now."

13        I don't have -- and the investigators simply

14    don't have the epilog to that conversation, but that's

15    April 24th of 2015, which I think is a reflection of

16    the defendant's mindset at that time.  Now, bear in

17    mind as well to put things in perspective, he had been

18    shot in February of 2015, two months earlier at the car

19    wash on Broad Street in Providence.  He was not

20    cooperative with the police or the police perception

21    was that he was not cooperative with their

22    investigation.  So the individual who shot him was not

23    identified by the police, but the strong suspicion was

24    that it was related to gang activity.

25        And as noted in the government's sentencing

1    memorandum, there was another shooting at that same car

2    wash when Christian Nunez was there on May 4th of 2015.

3    Stepping back, April 24th of 2015, he has this

4    conversation with an unknown caller.  Three days later,

5    April 27th of 2015, he has a conversation with

6    Mr. Hernandez.  And that's set forth at paragraphs 32

7    to -- excuse me, 32 and 33 of the presentence report.

8         And the significance of that conversation on

9    April 27th is this, your Honor:  Near 9:30 p.m.

10   Mr. Hernandez has a call with an individual who has

11   been identified by the agents as Quincy.  They didn't

12   know his actual identity.  Quincy tells Hernandez that

13   he's seen people on Croyland Road in Providence who are

14   perceived to be rivals of the C-Block TFD group.

15        Almost immediately after that conversation with

16   Mr. -- with Quincy, Mr. Hernandez has a conversation

17   with Mr. Sullivan.  And in that conversation,

18   Mr. Hernandez says Quincy had said that the "M.O. Prat

19   niggas over there on Croyland squatting," and then he

20   says -- then Mr. Hernandez talks about the fact that

21   they got poles over there, meaning, they got guns over

22   there according to Quincy.

23        M.O. Prat is slang or code for members of Pine

24   believed to be a rival gang to C-Block.  So at 9:34

25   Mr. Hernandez communicates this to Mr. Sullivan.  At

1    9:46, just a few minutes later, location monitoring of

2    Mr. Sullivan's phone places it in the area of Route 95

3    and Huntington Avenue in Providence.  That's about 4

4    miles away from -- in the 800 block of Prairie Avenue.

5         The significance of that space about 4 to 5

6    miles is 15 minutes later Mr. Sullivan is stopped on

7    Prairie Avenue or encountered on Prairie Avenue by

8    members of the Providence police and members of the

9    Safe Streets Task Force.  And they conduct what they

10   thought was a thorough search of his motor vehicle

11   believing that there was a firearm inside of it because

12   during that call at 9:30 between Mr. Sullivan and

13   Mr. Hernandez, Mr. Sullivan says to Mr. Hernandez, "I

14   wanna go over and slam on them," he says.  "I wanna do

15   something.  That'd be good, 'cause I got it on me," he

16   says.

17        So they stop the vehicle at 10:01.  It's

18   traveled 4 miles.  It believes Mr. Sullivan's 4 miles

19   from Huntington Avenue over to Prairie Avenue.  They

20   search the vehicle between 10:00 and 10:30.  They don't

21   find a firearm.

22        Shortly after he's encountered by the police,

23   Mr. Sullivan calls Mr. Hernandez and they have another

24   conversation.  In this conversation, Mr. Sullivan says,

25   he says, I was stopped.  "I said he's gonna find it,

1    nigga.  It was in the glovey, everything.  I don't know

2    how the fuck they didn't find it."

3          Then he goes on to describe what sounds -- and

4    this is in paragraph 33 of the presentence report --

5    describes -- it appears to be him describing how you

6    actually locate the firearm inside the vehicle.  And

7    then he says -- Mr. Sullivan says to Mr. Hernandez,

8    "And ya know what's crazy, nigga?  That I was gonna go

9    down, I was gonna just pull up to Van Buren" -- that's

10   a residence that's associated with Mr. Sullivan -- "and

11   I was like, no.  Fuck that, I'm gonna go flame on these

12   niggas.  I was like so easy.  Fuck them.  I'm just

13   puttin' my car on Prairie, flame on them and drive

14   off."

15         Prairie Avenue, the place where he was stopped,

16   your Honor, is one block over from Croyland Road, the

17   location where Mr. Hernandez had told him about a half

18   hour earlier that the M.O. Prat niggas were squatting.

19   This information, of course, was rapidly processed by

20   the investigators.  There were subsequent phone calls

21   that led investigators to believe that the firearm

22   wasn't in Mr. Sullivan's vehicle.

23         So by the time they could act, they simply

24   didn't have probable cause to go to a place and find

25   it.  But the fact of the matter remains that his own

1    words suggest between April 24th and April 27th what

2    his mindset was while he was out distributing drugs and

3    engaging as this manager of this drug-trafficking

4    operation.

5          So as I said earlier, your Honor, the

6    investigation was significant to investigate because

7    there was this unholy alliance between the drug

8    trafficking and the violent activity associated with

9    it.  So for these reasons, your Honor, we would suggest

10   that in that space between five years and six years,

11   that a sentence halfway between, five and a half years

12   to serve or 66 months, would be appropriate to

13   accomplish all of the objectives of Section 3553.

14         THE COURT:  All right.  Thank you, Mr. Daly.

15         MR. DALY:  Thank you, your Honor.

16         THE COURT:  Mr. Calcagni.

17         MR. CALCAGNI:  Good afternoon, your Honor.

18         THE COURT:  Good afternoon.

19         MR. CALCAGNI:  Your Honor, when Mr. Sullivan was

20   arrested back in 2015, he had the mind of a boy.  In

21   the last nearly two years, I can tell you as this

22   gentleman's lawyer, he's become a man.  A lot has

23   happened to Mr. Sullivan in the last two months that I

24   think this Court can agree has given him great insight

25   into his admitting this conduct, the impact it's had on

1    others, including himself, as well as family, friends

2    in the community and has given him a fresh outlook on

3    the future.

4         Your Honor, Mr. Sullivan sent a letter to you

5    authored in his own words, in his own handwriting, and

6    I played no role whatsoever in that letter, setting

7    forth his feelings about this case, how it's impacted

8    himself and others and how he intends to go forward in

9    the future.  And I hope your Honor will credit that

10   letter.

11        Your Honor, it should come as no surprise to you

12   that I'm asking for a sentence of 60 months.  I ask for

13   that sentence for a number of reasons.  Mr. Daly

14   referenced Mr. Sullivan's criminal history.  I'm sure

15   you noted in my written submission that I suggest to

16   you that the criminal history overstates the

17   seriousness of this gentleman's background.  He

18   essentially received one point in that criminal history

19   for minor possession of marijuana, $5 bag, nearly ten

20   years ago.

21        And when you consider where marijuana has come

22   in the last few years and that we're decriminalized

23   here in Rhode Island, what he was arrested and charged

24   for back then is not even criminal here today.  That's

25   just one way of looking at the fact that the criminal

1    history overstates the seriousness.

2         Mr. Daly referenced my point to the Court in

3    writing about the two-point enhancement for which he

4    was on state probation, and I have those arguments to

5    you in writing.  I don't want to belabor them.

6         What you need to decide today, your Honor, is

7    what's fair and reasonable in light of this defendant

8    in all facts and circumstances.  I was at the Wyatt

9    last night visiting Mr. Sullivan for the second day in

10   a row and on the way out, one of the high-ranking

11   officers there said to me, "Hey, Sullivan's involved in

12   that zombie heroin case?"  And I said, "Yeah, you

13   didn't know that?  He was the second guy in the

14   indictment."

15        And the officer tells me, "Wow, I'm really

16   surprised.  That kid is one of the most respectful,

17   polite guys around here.  When he first came in, he had

18   some issues, but believe me, that kid's well liked.

19   And I've heard that from a number of officers."

20        Why do I tell that to you?  I suggest that to

21   you today because this kid has changed.  He'll tell you

22   himself in a few moments.  If you take a look at the

23   mitigation evidence I submitted, he's used his time at

24   Wyatt wisely.  He's undergone classes, he's completed

25   them, he has a job of trust and responsibility and he

1    has never been to jail before in his life.  Yeah, he's

2    had quite a few problems along the way whether it be

3    his childhood, uprooted to Rhode Island from New York,

4    getting involved in the bad neighborhoods with the

5    wrong people in the wrong community, no doubt about it.

6    But this gentleman has an entirely changed outlook on

7    life and that's got to be important to you today, your

8    Honor, when you decide how much of a break, if you

9    will, you choose to give him.

10          Now, a few weeks ago Jonathan Hernandez was

11   before you for sentencing, and I learned that the Court

12   gave that gentleman a 72-month sentence.  The reason I

13   bring that to your attention is because you have to

14   compare today, your Honor, what you're going to give

15   Mr. Sullivan in light of what you did for

16   Mr. Hernandez.  I prepared a chart that I'd like to

17   reference just for purposes of argument.  And I gave it

18   to your clerk before Court took session today so we

19   didn't have to fire up the ELMO.  But Mr. Hernandez

20   came before the Court with a higher Criminal History

21   Category, nearly double the Criminal History points,

22   and a higher Guideline range of 121 to 151.  The Court

23   gave him about 60 percent of the lower end of the

24   Guidelines.

25          And when you do that math for Mr. Sullivan, the

1    numbers anyhow, pan out that he would get less than 60

2    months, which of course the law doesn't even authorize

3    here.  So comparatively speaking, considering

4    Mr. Hernandez who, according to the government's

5    evidence, the government's theory and the government's

6    investigation, falls below Mr. Hernandez on the

7    responsibility spectrum, if you will.  I suggest to the

8    Court that fairness would dictate he get a lesser

9    sentence.

10         The Court's going to ask Mr. Hernandez -- I'm

11   sorry, Mr. Sullivan -- what his plans are when he gets

12   out of jail.  Let me let your Honor know that he's

13   already thinking ahead.  You see these people in the

14   courtroom today?  It's a small Army of family, friends

15   who have come here to support him.  Some from inside of

16   Rhode Island, others from many miles away as far as

17   Georgia.

18         Mr. Sullivan's family gets the message that

19   Mr. Sullivan continuing to reside in Rhode Island,

20   continuing to be amongst the community, an environment

21   and of people who contributed to his actions and his

22   demise here today, must stop.  The family and Mr.

23   Sullivan are looking to relocate him to Georgia where

24   he can join his twin sister, who is a college graduate

25   and who has a career as a social worker, to give him a

1   real opportunity.

2            No, he's never been to college.  He didn't even

3   graduate high school.  But if you take a look at the

4   statements of support given by folks that know him, if

5   you take a look at the structure and the content of his

6   letter, one thing we all have to acknowledge, despite

7   the criminal history, despite his status here today,

8   this young man is intelligent, which means he knows

9   right from wrong, which means he has the ability and

10  potential to succeed.

11           I've done all I can for him as his lawyer.  Your

12  Honor has an ability to give him a second chance and a

13  fresh start.  He'll make most of all of the

14  opportunities available to him in the BOP just as he

15  has at the Wyatt, and I'm comfortable suggesting to

16  your Honor that I don't think we're going to see more

17  of Mr. Sullivan in the future.  For that I ask you to

18  give him a sentence of 60 months.

19           THE COURT:  Okay.  Thank you, Mr. Calcagni.

20           All right.  Mr. Sullivan, do you want say

21  anything before I impose sentence?

22           THE DEFENDANT:  Yes, your Honor.  First I want

23  to thank you, your Honor, for giving me the opportunity

24  to speak.  I hope you received my letter.

25           THE COURT:  I did.

1        THE DEFENDANT:  I hope you had a chance to read
2    it.
3        THE COURT:  I did.
4        THE DEFENDANT:  Thank you.  First and foremost,
5    I want to start by saying I want to apologize to the
6    United States government, my family, the Court, my
7    community, and even my codefendants that were very
8    young in this case, your Honor, and they didn't deserve
9    to be here.
10        I also want to say that my time here has helped
11    me reflect on the person I was, you know.  I'm in no
12    way proud of the person I was and the life I was
13    living.  I was a fool.  I was foolish, you know.  I
14    should have thought about my family and the
15    consequences and the pain that I put my kids and my
16    family through.
17        I've been through a lot being here, and it
18    helped me rehabilitate myself to really find out and
19    put my goals and my priorities together, your Honor.  I
20    know exactly what it is I want to do when I get out.  I
21    just want to make my family proud and be a good example
22    for my kids.
23        I have missed out on a lot of birthdays and
24    graduations and a lot of special moments that I know
25    I'll never get back in my kids' life, you know.  And I

1   just want to be there, and I want them to know that I

2   love them.  And I never want to put them through this

3   again, you know.

4         I never really did time before.  I never knew it

5   was going to be like this.  If I knew, I would have

6   never put my family through this, you know.  I just

7   want you to know, your Honor, that I'm really -- I

8   really regret my decisions, and I just hope you give me

9   a second chance to make my family proud again and to

10  show the Court my good intent.  Thank you, your Honor.

11        THE COURT:  All right.  Thank you, Mr. Sullivan.

12        So let me just ask you a couple of questions and

13  maybe make a few comments.  You know full well that

14  I've gotten to know this case very well through all the

15  defendants that I've had before me and particularly the

16  two defendants that I have taken into the what we call

17  our deferred sentencing program.  I get to spend time

18  with them every month, and I think I've gotten to know

19  them a little bit.  And they are doing so far really,

20  really well.  And they are very lucky that they have

21  been able to take advantage of a program like that and

22  avoid serious jail time.  They did spend some time in

23  jail as you know; you were with them.

24        So I think I've gotten a little bit of a picture

25  into this organization, into this world.  And I think

1   you've said it pretty well when you said you were all

2   acting in a really kind of foolish way.  And it's true,

3   but it's very dangerous foolishness.  This isn't a

4   game.

5        And Mr. Daly outlined some behavior on your part

6   that is pretty hard to ignore and it's pretty hard to

7   deny what Mr. Daly is saying about what was going on.

8   And I'm not an idiot, I'm not a fool; I can tell what

9   was going on here.  And now that you've had a little

10  time to spend in jail, you really see, you were that

11  close, you're that close from spending the rest of your

12  life in jail if you didn't get killed.

13       THE DEFENDANT:  Yes, your Honor.

14       THE COURT:  And, you know, it's this gang life

15  that for some reason seems so appealing and sexy and

16  whatever at the time you're in it.  I'll tell you just

17  very briefly, I have spent time down in Puerto Rico

18  where I help out with the judges down there.  And it's

19  this gang life way beyond anything you have ever even

20  thought of in terms of the killing and the violence;

21  killing gang members, killing each other, killing

22  police officers, shooting down police helicopters,

23  shooting innocent people driving down the highway while

24  they shoot 600 bullets at each other, trying to take

25  control of one housing project or another.  Defendants

1    who ended up facing the death penalty who narrowly

2    escaped the death penalty by one vote of a juror and

3    other defendants who I have sentenced to life without

4    parole.  And in the federal system life without parole

5    means the rest of your life, and it's given me a

6    perspective on where this could go, where this life

7    goes.

8          So we sit up here in Providence and we have

9    these problems and we think these problems are bad, and

10   they are bad, but you go down there and spend a little

11   time and you could see what it could become.  It's El

12   Salvador is what it is.  That's how bad it is.

13         And that's the track that you are starting to

14   take the steps to be on.  And that's why law

15   enforcement is cracking down and acting quickly like

16   they did in this case to interdict where you and others

17   were about to do stuff that could take you in that

18   direction.  And it's a big credit to them that they

19   were able to respond so quickly.  In a lot of ways they

20   saved your life.

21         THE DEFENDANT:  Yes, your Honor.

22         THE COURT:  So I mention all that just to

23   reinforce the idea that this is the path that you were

24   on.  And you were not just on it yourself, but you were

25   bringing others with you, guys like Marklyn Brown and

1    Christian Nunez who are just kids.  And you were

2    bringing them along, you and others.

3          So now, I've taken an approach with the

4    sentences in this case to try to recognize that we

5    can't just put people in prison and expect everything

6    magically to get better.  And that's why I put Marklyn

7    Brown and Christian Nunez into that deferred sentencing

8    program.  Mr. Daly argued against that, and I have a

9    lot of respect for the arguments that he made -- or at

10   least he urged caution and he had good reason to do so,

11   but I really do believe that as bad as a lot of this

12   stuff is, they got you in time so that you have an

13   opportunity to turn this around.

14         Now, you're not going to have the benefit of a

15   program like that, but you have the opportunity to turn

16   it around by using the time that you spend in prison

17   constructively and making good on all the things that

18   you've said here today and your attorney has said here

19   today about what you want to do.  And it is impressive;

20   you have all these people here to support you and

21   you're very lucky that you have this much support.

22         THE DEFENDANT:  Yes, your Honor.

23         THE COURT:  So you have the structure to make it

24   work when you get out.  But at the end of the day, it's

25   going to be up to you.  None of them can make this

1    work.  Only you can make it work.

2         So, you know, I have to believe that the

3    sentences that I've been trying to impose here are

4    enough to get a message across to all of you, but not

5    so much that you can't recover from them.  And I want

6    you to have the opportunity to turn it around.  And I

7    think a sentence that the Guidelines would call for, if

8    I were to sentence you to that kind of time, I think it

9    would be too much and that's what I said to

10   Mr. Hernandez.  I think it would be too much.

11        So, you know, you've come along after I've

12   sentenced a lot of others so, as Mr. Daly recognized,

13   you know, here we are.  The mandatory minimum at the

14   low end, I sentenced Mr. Hernandez to 72 months so

15   there's not a lot of room there.  So it isn't a big

16   mystery where you're going to end up.  You're going to

17   end up in that range.

18        I think Mr. Daly's suggestion of 66 months is

19   appropriate and that's what I'm going to impose.  It's

20   only six months above the mandatory minimum.  It's a

21   symbolic six months.  Symbolic because it represents

22   basically where you stood in the organization.  And

23   that's really the only significant difference between

24   you and Hernandez is that you were not the top guy, but

25   you were the second guy, as I understand it.

1        So, you know, that's the sentence that I think

2   is appropriate and that I'm going to impose.  I hope

3   that with all the support, with all of what you've said

4   in your letter, with all that you have suggested here

5   through Mr. Calcagni, that this really will be the

6   warning shot for you, the shot that keeps you and

7   teaches you that this is not where you want to be for

8   the rest of your life.

9        I've seen the other side.  You don't want to be

10  there.  You've seen the inside, and I know you don't

11  want to be there.  So that's really all that I have to

12  say before imposing sentence.

13       It sounds like your intention is to relocate to

14  Georgia, is that right?

15       THE DEFENDANT:  Yes, your Honor.

16       THE COURT:  Okay.

17       THE DEFENDANT:  I also want to get my CDL and

18  take whatever trades I could.  I really want to do HVAC

19  and electronics.

20       THE COURT:  All right.  Well, that's good.

21  You're going to have -- hopefully you'll have some

22  opportunities when you're in the federal facilities to

23  experiment with some trades and some skills.  I have

24  been through a lot of prisons, federal prisons, around

25  the country and some of them have really good programs,

1   particularly the one up in New Hampshire, Berlin, New

2   Hampshire.  And you might have an opportunity to

3   develop some of those interests in those facilities.

4   So you should really pursue it.

5       So all right.  So in the matter of the United

6   States vs. Davis Sullivan, the defendant is remanded to

7   the custody of the federal Bureau of Prisons for a term

8   of incarceration of 66 months to be followed by four

9   years of supervised release.  There will be no fine in

10   this matter.  There is a special assessment of $100

11   that the defendant is required to pay.

12       During his term of supervised release, the

13   defendant will participate in a program of substance

14   abuse treatment, a program of substance abuse testing,

15   up to 72 drug tests per year, and he shall contribute

16   to the cost of all ordered treatment and testing if he

17   has the ability to pay as determined by the probation

18   officer.

19       Although it hasn't been suggested by anyone, I

20   believe another appropriate restriction during the

21   defendant's supervised release is to restrict his

22   contact with the other members of the gang, C-Block,

23   the same no-contact group that I imposed on Mr. Brown

24   and Mr. Nunez.  I believe it would be the same group.

25   So I'm going to ask the government to prepare that

1    list, and I'm going to impose that no-contact

2    requirement on you as well.

3         I don't know if you're aware of what I'm talking

4    about.  Are you?

5         THE DEFENDANT:  Yes, your Honor.

6         THE COURT:  All right.  Well, I think if you

7    move to Georgia, it's not really going to be an issue

8    for you.  But in the event you don't, I don't want you

9    associating with those folks during your term of

10    supervised release.  That's one way to ensure that you

11    don't go back into that world.

12         THE DEFENDANT:  I understand, your Honor.

13         THE COURT:  All right.  The defendant, I believe

14    he waived his right to appeal as part of his plea

15    agreement.

16         MR. CALCAGNI:  No, your Honor.

17         THE COURT:  No?

18         MR. CALCAGNI:  This was a naked plea.

19         THE COURT:  This was not a plea agreement?  All

20    right.  Then my mistake.

21         Then I need to advise you that you have the

22    right to appeal the sentence that I've just imposed.

23    If you want to appeal it, you have to do that within 14

24    days of the judgment which means 14 days essentially

25    from today or tomorrow.  Mr. Calcagni can assist you

1    with an appeal if you wish to do that.

2         All right.  Is there anything further that we

3    need to take up?

4         MR. DALY:  I don't believe so, your Honor.

5         MR. CALCAGNI:  Your Honor, I had two

6    recommendations at the end of the sentencing memo.  One

7    being a recommendation on placement.  The second being

8    a recommendation on RDAP if he qualifies.

9         THE COURT:  Where was the placement request?

10        MR. CALCAGNI:  As close to Rhode Island as

11   possible just because of the small children.

12        THE COURT:  All right.  I'm happy to recommend

13   both of those things, that you be considered for the

14   RDAP program if you qualify.

15        THE DEFENDANT:  Thank you, your Honor.

16        THE COURT:  And as far as placement close to

17   Rhode Island, I do agree that that would be helpful.

18   I'm not actually sure which facility is closest to

19   Rhode Island at this point.

20        Do you know, Mr. Calcagni?

21        MR. CALCAGNI:  Your Honor, I know there's

22   Devens, there's Dix, there's the one in New Hampshire.

23   A lot will have to do with how they classify him.

24        THE COURT:  I doubt you qualify for Devens, but

25   if you do end up in Berlin in New Hampshire, there are

1    -- as I said, it's -- I was just in that facility maybe

2    six, eight months ago.  It's a very impressive

3    facility.  So I'll recommend you be incarcerated in the

4    closest facility that is feasible.

5           All right.  We'll be in recess.

6           THE DEFENDANT:  Thank you, your Honor.

7           COURTROOM DEPUTY:  All rise.

8           (Time noted:  4:14 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                        **CERTIFICATION**

3    I certify that the foregoing is a correct transcript from the

4    record of proceedings in the above-entitled matter.

5

6

7    Official Court Reporter                  July 24, 2017

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25